AO 91 (Rev. 11/11)  Criminal Complaint

DOA
7/21/2026

# UNITED STATES DISTRICT COURT
### for the District of Arizona

|  |  |
|---|---|
| United States of America<br>v.<br>1. Jose Raul Ahumada-Lugo<br>Count 1<br>(Citizen of Mexico)<br>2. Rony Ramirez -Valenzuela<br>Counts 1 and 2<br>(Citizen of Mexico)<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.   26-6287MJ |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### COUNT 1

On or about July 21, 2026, in Pinal County, in the District of Arizona, JOSE RAUL AHUMADA-LUGO and RONY RAMIREZ-VALENZUELA, knowing and in reckless disregard of the fact that certain aliens, namely: Carmen Quintero-De Jesus and Erick Cantu-Villegas had come to, entered, and remained in the United States in violation of law, did knowingly transport and move said aliens within the United States by means of transportation and otherwise, in furtherance of such violation of law.

In violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (a)(1)(B)(ii), (Transportation of an Illegal Alien).

### COUNT 2

On or about July 21, 2026, RONY RAMIREZ-VALENZUELA, an alien, was found in the United States at or near Eloy, Arizona, in Pinal County, in the District of Arizona, after having been previously denied admission, excluded, deported, and removed from the United States at or near Nogales, Arizona, on or about August 15, 2017, and not having obtained the express consent of the Attorney General or the Secretary of Homeland Security to reapply for admission to the United States.

//

//

//

//

//

In violation of Title 8, United States Code, Section 1326(a) (Reentry of Removed Alien).

This criminal complaint is based on these facts:

See attached Statement of Probable Cause, incorporated by reference herein.

☒ Continued on the attached sheet.

JOSHUA A MATTOO  Digitally signed by JOSHUA A MATTOO
Date: 2026.07.23 10:11:37 -07'00'

_____
*Complainant's signature*

Reviewed by AUSA Madeline Shupe for AUSA Matthew Greve

*Madeline Shupe*  Digitally signed by
MADELINE SHUPE
Date: 2026.07.23 10:47:45
-07'00'

Joshua Mattoon, Border Patrol Agent

_____
*Printed name and title*

Sworn to before me and subscribed telephonically.

Date:   July 23, 2026 @12:34pm

_____
*Judge's signature*

City and state: Phoenix, Arizona

Honorable Alison S. Bachus, U.S. Magistrate Judge
*Printed name and title*

## STATEMENT OF PROBABLE CAUSE

I, Joshua Mattoon, a United States Border Patrol Agent, being duly sworn, declare and state as follows:

## INTRODUCTION AND BACKGROUND OF AFFIANT

1.    Your Affiant is a United States Border Patrol Agent (BPA) assigned to the Casa Grande Border Patrol Station Prosecutions Team. With seventeen years of experience as a Federal Agent, your Affiant has been cross-certified under A.R.S. § 13-3875 as a peace officer with the Pinal County Sheriff's Office. Your Affiant has served on multiple Targeting Enforcement Units, including the West Desert Task Force, System Surveillance Team, and Advanced Processing Team.

2.    Through assignments with these units, your Affiant has gained extensive experience in casework involving human and drug smuggling. Drawing upon casework, specialized training, and years of service, your Affiant has developed a comprehensive understanding of the tactics, techniques, and procedures employed by transnational criminal organizations.

3.    On numerous occasions, your Affiant has collaborated with local and federal law enforcement agencies, such as the Pinal County Sheriff's Office, Arizona Department of Public Safety, Homeland Security Investigations, Department of War, Sector Intelligence, and the United States Attorney's Office, to further develop and advance casework.

4.    In preparing this Affidavit, I conferred with other law enforcement officials, who share the opinions and conclusions stated herein.  I have personal knowledge of the following facts or have learned them from other law enforcement officers.  I also relied on my training, experience, and background in law enforcement to evaluate this information. Since this Affidavit is being submitted for the limited purpose of establishing probable cause for a complaint, I have not included each and every fact or source of information establishing the violation of federal law.

## PROBABLE CAUSE

*Pinal County Sheriff Stop*

5.      On July 21, 2026, at approximately 8:23 p.m., a deputy with the Pinal County Sheriff's Office was traveling west on Interstate 10 ("I-10") when he observed a blue Ford F-150 ("F-150") bearing Arizona license plate DFA096 cross over the white lane markings with both the front and rear passenger tires. This is a violation of Arizona Revised Statute § 28-644(A)(1).

6.      Based on this violation of Arizona law, the deputy activated his emergency lights to initiate a traffic stop. The F-150 yielded, pulling over to the right shoulder near mile marker 203.

7.      When the deputy approached the F-150 from the passenger side, he spoke with the driver, who was Spanish-speaking and verbally identified himself as "Jose" due to not having any form of identification. The driver was later identified as JOSE RAUL AHUMADA-LUGO ("AHUMADA").

8.      The deputy asked AHUMADA if the F-150 belonged to him, and AHUMADA replied that it did not. The deputy then asked AHUMADA who the owner of the F-150 was, and AHUMADA provided only a first name, "Ventura." When asked for Ventura's last name, AHUMADA stated he did not know. The deputy then asked AHUMADA to exit the F-150 and accompany him to his patrol vehicle while he issued a written warning.

9.      While completing the written warning, the deputy conversed with AHUMADA and asked where he was coming from. AHUMADA informed the deputy that he was coming from Tucson, Arizona, after picking up his friends and was traveling to Phoenix. However, before the stop, the deputy had run the F-150's license plate through a commercial license plate reader and discovered that the F-150 had traveled further east of Tucson earlier that day, around 3:00 p.m.

10.     While the deputy was speaking to AHUMADA, a second deputy arrived on scene to assist. After verifying the VIN number of the F-150, the assisting deputy spoke to

the remaining passengers. The assisting deputy informed the primary deputy that the passengers told him they were coming from work in Tucson and traveling to Phoenix, but did not know where in Phoenix. Additionally, the assisting deputy noticed camouflage backpacks and clothing shoved under the rear seating area.

11.     Based on the location (which was known to the deputies as a smuggling route), the camouflage clothing commonly used in smuggling events, and the occupants' inconsistent stories compared to AHUMADA's statement, the deputy believed he had encountered a human smuggling event and requested his dispatch contact the United States Border Patrol for further assistance.

*Border Patrol Encounter*

12.     At approximately 8:42 p.m., Border Patrol Agents ("BPAs") from the Casa Grande Border Patrol Station arrived on scene and spoke to AHUMADA, who informed the BPAs that the F-150 belonged to a friend, the occupants were his friends, and that they were driving around. When BPAs conducted an immigration inspection, AHUMADA admitted to being an illegal alien and unlawfully present in the United States.

13.     BPAs conducted an immigration inspection on the remaining four individuals in the F-150. BPAs confirmed that all of the passengers were citizens of Mexico unlawfully present in the United States. The front passenger was identified as RONY RAMIREZ-VALENZUELA ("RAMIREZ"); the rear passengers were identified as Angel Humberto Payen-Ochoa ("Payen"), Carmen Quintero-De Jesus ("Quintero"), and Erick Cantu-Villegas ("Cantu").

14.     After determining their immigration status, a BPA asked the passengers how they knew each other, and they said they worked together in Tucson as painters. While the BPA was speaking to the passengers, one of the deputies on scene informed the BPA that there were two camouflage backpacks on the floorboard of the back seat. The BPA then asked who the camouflage backpacks belonged to. Quintero and Cantu stated the backpacks belonged to them.

15.    The BPA asked Cantu and Quintero to exit the F-150 and tell the truth about when they crossed the border. Both Cantu and Quintero admitted that they crossed that day around noon. The BPA asked Cantu and Quintero how they knew the other subjects in the vehicle (AHUMADA, RAMIREZ, and Payen), and they stated that the other three subjects picked them up earlier that day near a dirt road.

16.    Based on this conversation, the BPA determined that this was a smuggling event. BPAs then transported all the occupants to the Casa Grande Border Patrol Station for further processing.

17.    At the Casa Grande Border Patrol Station, BPAs confirmed through fingerprint analysis that AHUMADA, RAMIREZ, Payen, Cantu, and Quintero, are citizens of Mexico. BPAs confirmed that none of the occupants had current, pending, or archived visas or permissions allowing them to be lawfully present in the United States.

18.    Additionally, immigration history checks revealed that AHUMADA had a pending removal order from an immigration judge dated April 14, 2025; RAMIREZ had previously been denied admission, excluded, deported, and removed from the United States on August 15, 2017, at or near Nogales, Arizona; and Payen had previously been denied admission, excluded, deported, and removed from the United States on January 28, 2024, at or near San Luis, Arizona.

*Driver: AHUMADA's Interview*

19.    At approximately 11:44 p.m., BPAs read AHUMADA his *Miranda* rights. AHUMADA stated and signed a written form acknowledging that he understood his rights and that he was willing to make a statement without the presence of an attorney.

20.    AHUMADA stated that he was born in Mexico, and is a citizen of Mexico. He stated that he is illegally present in the United States and possesses no immigration documents. AHUMADA stated that he has been in the United States illegally for approximately two years.

21.    AHUMADA admitted that on January 30, 2024, he crossed the International Border Fence (IBF) that separates Mexico and the United States as part of a group of

approximately 60 individuals. AHUMADA stated that he has been living in Phoenix, Arizona, for approximately two years.

22.     AHUMADA stated that he had been working in construction/stucco in Phoenix, Arizona, along with his two friends, RAMIREZ and Payen. AHUMADA stated that he has known RAMIREZ for approximately one month and Payen for approximately three months.

23.     BPAs asked AHUMADA how he got involved in the transportation of illegal aliens. AHUMADA stated that his friend RAMIREZ, who was also arrested with him, introduced him to the transportation of illegal aliens. AHUMADA stated that today was his fourth time picking up illegal aliens for money. AHUMADA stated that he has been doing this for the last two weeks and explained that on his first trip transporting aliens, he successfully transported one alien to Phoenix, Arizona. On his second trip, he successfully transported two aliens to Phoenix, Arizona. On his third trip, he successfully transported three aliens to Phoenix, Arizona. AHUMADA stated that he was under the impression that today he was going to pick up three illegal aliens (IAs) but only picked up two.

24.     AHUMADA stated that he does not recall where he picked up the two illegal aliens earlier today and stated that there is a group chat on his cellphone in WhatsApp where he was given GPS pings by smuggling coordinators. He believes these coordinators are in Mexico because they have Mexican phone numbers. AHUMADA stated that he last recalls picking up the IAs within the vicinity of Tucson, Arizona. AHUMADA stated that his intent was to transport them to Phoenix, Arizona, but he did not give a specific location since the smuggling coordinator usually provides that information via GPS pings when they arrive in the general area of Phoenix, Arizona.

25.     AHUMADA stated that during his successful trips transporting illegal aliens, he was instructed to drop them off in different areas in Phoenix, Arizona—usually at gas stations or to a different vehicle.

26.     BPAs asked AHUMADA about the vehicle he was arrested in. AHUMADA stated that he is not the owner of the vehicle and took it from his neighbor, who is not aware

it was taken. AHUMADA stated that his neighbor is not involved in the transportation of aliens.

27.    AHUMADA admitted that he was aware that the two passengers were in the United States illegally and accepted full responsibility for his actions. AHUMADA stated that the aliens were wearing camouflage clothing when he picked them up in the desert near an unknown mountain, at approximately 5:00 p.m.

28.    AHUMADA admitted that he was going to receive $1,000.00 USD per IA as payment for transporting them to Phoenix. AHUMADA stated that he usually splits the payment with RAMIREZ.

29.    BPAs asked AHUMADA for consent to search his cellphone, and he gave verbal and written consent. After reviewing the contents on AHUMADA's cellphone, BPAs found a group chat containing four individuals with multiple messages and audio messages in the Spanish specifically planning and reporting information related to the transportation of illegal aliens.

30.    AHUMADA confirmed that no one absconded after being pulled over by police and that everyone involved in this event was arrested.

*The front seat passenger, RAMIREZ's Interview*

31.    On June 22, 2026, at approximately 1:17 a.m., BPAs read RAMIREZ his *Miranda* rights. RAMIREZ stated and signed a written form acknowledging that he understood his rights and that he was willing to make a statement without the presence of an attorney.

32.    RAMIREZ said he is a citizen of Mexico. At the time of his arrest, RAMIREZ did not possess any immigration documents that would allow him to be present in or remain in the United States legally.

33.    RAMIREZ stated that he works in construction, performing stucco work, and has been employed in this field for approximately five years. He reported working with AHUMADA and Payen, who were also arrested with him. RAMIREZ indicated that he has known them for two to three months and considers AHUMADA a friend.

34.     RAMIREZ admitted that on June 20, 2020, at approximately 7:00 p.m., he crossed the IBF near Nogales, Arizona. He stated that he crossed the border as part of a group consisting of two other aliens and a foot guide. He eventually traveled to Phoenix, Arizona, where he has been living.

35.     RAMIREZ said that he and AHUMADA have been involved in picking up IAs for several months. They have been working for two unidentified coordinators, whom he communicates with via WhatsApp. According to RAMIREZ, he receives $500 USD for each IA they pick up, while AHUMADA receives $1,000 USD per person. He claimed to have participated in two previous pickups: the first involving one individual and the second involving two. On the day of his arrest, RAMIREZ stated that they had agreed to pick up two IAs, and was going to be paid $500 USD only.

36.     RAMIREZ provided BPAs consent to search his cellphone. BPAs discovered that RAMIREZ and AHUMADA have several WhatsApp conversations with the coordinators about depositing money to them. RAMIREZ mentioned that they charge the illegal aliens money before letting them go, and some of the money gets deposited in Mexican accounts for wire transfers to pay the smuggling coordinators.

37.     On the day of the arrest, RAMIREZ, AHUMADA, and Payen traveled toward Tucson to pick up two illegal aliens. RAMIREZ stated he was unsure of Payen's level of involvement, as he does not know him well.

38.     In the WhatsApp messages, the coordinators instructed AHUMADA and RAMIREZ to proceed toward Tucson, and would provide further instructions. The coordinators eventually sent a location pin near Sierra Vista, Arizona, where the trio picked up the two IAs.

39.     While driving to Phoenix, they stopped at a gas station near Tucson. As they continued toward Phoenix, their vehicle was stopped by officers after AHUMADA crossed over the white line. All five occupants were subsequently arrested and turned over to Border Patrol custody.

*Material Witness Interview: Carmen Quintero-De Jesus*

40.    At approximately 1:37 a.m. BPAs conducted a video-recorded interview of Carmen Quintero-De Jesus ("Quintero"). Quintero is a citizen of Mexico. At the time of her arrest, Quintero said she was not in possession of any immigration documents that would allow her to be in or remain in the United States legally. Quintero stated that her boyfriend's father told them to go to Naco, Sonora, Mexico, and that he would make the smuggling arrangements with an unknown coordinator. She stated that both of their smuggling fees were going to be paid by an individual who resides in the United States but she could not specify where. She stated the smuggling fee was going to be 300,000 Mexican Pesos, plus an additional 35,000 Mexican Pesos that she had already paid as a mafia fee. She stated that would cover all smuggling arrangements, including the mafia fee and transportation. Her final destination in the United States would be Santa Ana, California.

41.    Quintero said she traveled with her boyfriend, Cantu. Quintero stated she traveled from Tuxtepec, Guerrero, Mexico, to Naco, Sonora, Mexico, where they were picked up by a guide and taken to a motel where they spent three days. Quintero stated there were eight other people in the hotel room and that a caretaker would provide them with food. Quintero stated that after waiting for three days, they were picked up by two guides on a four-wheel ATV and taken to the IBF, where one of the guides provided her with a blue Motorola cellphone.

42.    Quintero said she crossed the IBF on July 21, 2026, at approximately 7:00 a.m., near Naco, Arizona. Quintero stated she crossed the border by crawling under the border wall within a group of two illegal aliens. After crossing the IBF, she was in contact with the guides in Mexico who were giving her directions. She walked until approximately 9:20 a.m., when she was instructed to stop and wait for a blue truck. Quintero stated she waited all day until she was picked up at approximately 5:30 p.m.

43.    When the truck arrived, Quintero admitted that both she and Cantu entered the back seating area of the blue truck. Quintero stated there were three male occupants in

the vehicle when they got in, and none of them spoke to her. Quintero described the male occupant sitting in the back as skinny. She described the male occupant sitting up front in the co-pilot seat as an older male, approximately 38 years old. She described the driver as a little chubby.

44.    Quintero stated that after approximately 30 minutes, she took her camouflage clothing off, stowing it in her backpack. Quintero stated that they stopped at a gas station, where the three male occupants provided them with juice.

45.    Quintero stated that after being in the truck for about two hours, they were stopped by the police. She stated all five of them were then turned over to Border Patrol custody.

46.    Quintero was shown a six-pack photographic line-up and identified the photo of AHUMADA as "como chofer" meaning like the driver.  Quintero was shown a second six-pack photographic line-up and was unable to identify RAMIREZ as the front seat passenger.  Quintero was shown a third six-pack photographic line-up and was unable to identify Payen as the rear seat passenger.

*Material Witness Interview: Erick Cantu-Villegas*

47.    At approximately 6:58 a.m. BPAs conducted a video-recorded interview of Carmen Erick Cantu-Villegas ("Cantu"). Cantu admitted to being a citizen of Mexico. When asked if he possessed documentation authorizing his legal presence in the United States, Cantu stated he possessed no such documents. Cantu stated his journey originated in Guerrero, Mexico, on July 15, 2026, where he traveled to Sonora, Mexico, and resided at a residence with his wife for one week. Cantu stated they were provided with food, water, and camouflage to conceal themselves from Border Patrol Agents. Cantu stated he agreed to pay a guide $40,000 MXN to facilitate his illegal entry into the United States and to be taken to California.

48.    On July 21, 2026, Cantu and his wife were transported to the IBF and waited five hours before crossing. When asked about the delay, Cantu stated they waited due to a high volume of Border Patrol Agent activity in the area. Cantu admitted that on July 21,

2026, at 5:00 p.m., he crossed into the United States. Cantu stated he was provided with a cellular phone by the foot guide to receive instructions for navigating to the pickup location. Cantu stated they traveled on foot for approximately one day.

49.     Upon arrival at the pickup location, Cantu and his wife were instructed to conceal themselves and wait for a blue pickup truck. They were instructed to board the rear passenger area of the vehicle and remove their camouflage upon the vehicle's arrival.

50.     Cantu stated they were in the vehicle for approximately four to five hours before being stopped by officer. When asked if he had been provided with instructions regarding concealment or fleeing the vehicle prior to the traffic stop, Cantu stated he received no such instructions. After being pulled over, Cantu, his wife, and all other occupants of the vehicle were apprehended by Border Patrol Agents.

51.     Cantu was shown a six-pack photographic line-up and identified AHUMADA as the driver of the F-150.  Cantu was shown a second six-pack photographic line-up and was unable to identify RAMIREZ as the front seat passenger.  Cantu was shown a third six-pack photographic line-up and was unable to identify Payen as the rear seat passenger.

//

//

//

//

//

//

//

//

//

## CONCLUSION

52.    Based on the facts and circumstances stated in this Affidavit, I submit there is probable cause to believe that the defendants, JOSE RAUL AHUMADA-LUGO and RONY RAMIREZ-VALENZUELA, knowing or in reckless disregard of the fact that certain aliens, namely: Carmen Quintero-De Jesus and Erick Cantu-Villegas, had come to, entered, or remained in the United States in violation of law, did knowingly transport or move said aliens within the United States by means of transportation or otherwise, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (a)(1)(B)(ii).

53.    In addition, I believe there is sufficient evidence to establish probable cause that the defendant, RONY RAMIREZ-VALENZUELA, violated Title 8, United States Code, Section 1326(a) (Reentry of Removed Alien).

JOSHUA A MATTOON
Digitally signed by JOSHUA A MATTOON
Date: 2026.07.23 10:12:16 -07'00'

Joshua Mattoon
Border Patrol Agent
United States Border Patrol

Sworn to before me and subscribed telephonically on this ___23rd___ day of July, 2026.

HONORABLE ALISON S. BACHUS
United States Magistrate Judge